WILLIAM E. TELLING v. J. J. SULLIVAN ET AL.

1. BANK OFFICIAL GRATUITOUSLY ENGAGING TO FIND PURCHASER FOR CUSTOMER'S STOCK BECOMES AGENT PRECLUDING HIS PURCHASE WITHOUT DISCLOSING FACT.

A bank official who gratuitously engages to find a purchaser for certain stock owned by a customer of the bank, thereby becomes the agent of said customer and cannot thereafter himself be-

Telling v. Sullivan.

come the purchaser of said stock without full disclosure of that fact to his principal and the latter's assent thereto.

2. FOUR YEARS' LAPSE OF TIME OF DISCOVERY OF FIDUCIARY RELATION NOT BAR TO RESCISSION OF SALE.

Mere lapse of time, short of four years from the discovery by the principal that the agent bought the stock for himself, will not bar an action in equity for the restoration of the stock, notwithstanding meanwhile it has greatly increased in value.

[Syllabus by the court.]

APPEAL from common pleas court.

*Smith, Taft & Arter* and *S. H. Tolles,* for plaintiff.

*White, Johnson & Cannon,* for defendants:

Colonel Sullivan was agent for Mr. Telling, no consideration for agency being necessary. 31 Cyc. 1216; 1 Am. & Eng. Enc. Law 950.

An agent to sell cannot purchase for himself. 4 Am. & Eng. Enc. Law 966; *Taussig* v. *Hart,* 58 N. Y. 425; 1 Am. & Eng. Enc. Law (2 ed.) 1077; *James* v. *James,* 55 Ala. 525; Dos Pasos, Stock Brokers p. 365; *Peckman Iron Co.* v. *Harper,* 41 Ohio St. 100; *Welsh* v. *Perkins,* 8 Ohio 52 [28 Am. Dec. 640]; *Armstrong* v. *Huston,* 8 Ohio 552; *Mitchell* v. *Dunlap,* 10 Ohio 120; *Glass* v. *Greathouse,* 20 Ohio 503, 515; *Barrington* v. *Alexander,* 6 Ohio St. 189; *Caldwell* v. *Caldwell,* 45 Ohio St. 512 [15 N. E. Rep. 297]; *Davoue* v. *Fanning,* 2 Johns. Ch. (N. Y.) 252; *Piatt* v. *Longworth,* 27 Ohio St. 159; Mechem, Agency Secs. 454, 455, 456, 461, 463, 464, 952; Pomeroy, Eq. Jur. Sec. 958; Perry, Trusts 195, 197; *Van Epps* v. *Van Epps,* 9 Paige (N. Y.) 237; *Cox* v. *John,* 32 Ohio St. 539.

If J. J. Sullivan could not purchase from Telling, Corliss could not; for J. J. Sullivan could not do indirectly what he is forbidden to do directly. *Tyler* v. *Sanborn,* 128 Ill. 136 [21 N. E. Rep. 193; 4 L. R. A. 218; 15 Am. St. Rep. 97]; *Trice* v. *Comstock,* 121 Fed. Rep. 620 [57 C. C. A. 646; 61 L. R. A. 176]; Pomeroy, Eq. Jur. Secs. 959, 963; *Frazier* v. *Jeakins,* 64 Kan. 615 [68 Pac. Rep. 24; 57 L. R. A. 575].

The finding of the stock in the possession of Col. Sullivan immediately raises a presumption of breach of his duty as agent.

*McGar* v. *Adams,* 65 Ala. 106; *Walker* v. *Derby,* 5 Biss. (U. S.) 134.

The doctrine of laches does not apply. Pomeroy, Eq. Jur. Sec. 817, p. 1449; *Brissell* v. *Knapp,* 155 Fed. Rep. 809; *Daggers* v. *Van Dyck,* 37 N. J. Eq. 130, 137; *Hawley* v. *Von Lanken,* 75 Neb. 597 [106 N. W. Rep. 456]; *Pacific Ry.* v. *Railway,* 20 Fed. Rep. 277; *Bogan* v. *Mortgage Co.* 63 Fed. Rep. 192, 199 [11 C. C. A. 128]; *Kelley* v. *Boettcher,* 85 Fed. Rep. 55, 62 [29 C. C. A. 14; 56 U. S. App. 363]; *Ide* v. *Carpet Co.* 115 Fed. Rep. 137, 148 [53 C. C. A. 341]; *Brun* v. *Mann,* 151 Fed. Rep. 145 [80 C. C. A. 513; 12 L. R. A. (N. S.) 154]; *Parker* v. *Hotel Co.* 96 Tenn. 252 [34 S. W. Rep. 209; 31 L. R. A. 706]; *Longworth* v. *Hunt,* 11 Ohio St. 194, 201; *Mack* v. *Brammer,* 28 Ohio St. 508, 516.

**WINCH, J.**

By this action, which is brought here on appeal, the plaintiff seeks to effect a rescission of the sale, which was made by him to the defendants, May 20, 1908, of 170 shares of stock in the Peerless Motor Car Company. The purchase price of $90 per share, or $15,300 in all, has been tendered back, and the plaintiff prays for the restoration to him of said stock and for an accounting of the dividends meanwhile paid to the defendants thereon. He contends that the defendant, J. J. Sullivan, while acting for the plaintiff, as his agent to sell said stock, purchased the same for himself and his son Corliss, without disclosing to plaintiff their identity as such purchasers. The defendant, J. J. Sullivan, was president of the bank where plaintiff and his firm, the Telling Brothers, did some, at least, of their banking business, and it is admitted that plaintiff consulted him about the sale of this stock; but Colonel Sullivan now denies that he undertook to act for plaintiff in that behalf. His first answer filed herein is, however, significant as setting forth in detail, on oath and over his own signature, his version of the conversation had between plaintiff and himself. This answer is superseded, as a pleading in the case, by the amended answer subsequently filed on leave obtained. But its admissions are in evidence, and the language used by the parties in their in-

Telling v. Sullivan.

terviews is so carefully and minutely rehearsed, in contradistinction to plaintiff's version thereof as alleged in his petition, that we cannot acquiesce in the suggestion now made, of a misconception by defendants' counsel as to the words used by his client, and of an oversight by the latter in signing and verifying the same when embodied in the answer.

It is worth while to quote the averments of the original answer at length:

"He denies that he had with plaintiff the conversations set forth in said petition, or that he ever, in any way, acted as agent for plaintiff in and about the sale of the stock mentioned in said petition, or any part of it, or as the representative of plaintiff in and about such sale; he denies that he ever advised plaintiff to sell said stock, or any of it, or was, in any way, responsible or the cause of his making said sale.

"He avers that the statements contained in said petition, in manner and form as therein stated, are untrue, and avers that the facts in relation thereto are these:

"About May 5, 1908, plaintiff told this defendant that he thought of selling his stock in the Peerless Motor Car Company, which he said had cost him par, and said he thought he ought to get that for it. This defendant replied to plaintiff that he would see what could be done about it. About May 15, 1908, plaintiff asked defendant if he had heard of any probable buyer, and defendant told him that he knew of a person who would give him $90 a share cash. Plaintiff said he did not like to sell it for less than it cost him, but would think about it. About May 20, plaintiff informed defendant that he had made up his mind to let his stock go at $90. This defendant asked plaintiff: 'Why do you want to sell it?' Plaintiff said: 'Oh, I want to raise a good deal of money at present.' Defendant replied: 'I would be glad to loan you all you want,' to which plaintiff answered: 'I would rather sell some things I have than go in debt so much.'

"This defendant did not advise said sale, but instead sought to dissuade plaintiff from making it.

"In the interval between plaintiff's first speaking to this

defendant on the subject, and said May 20, this defendant had made inquiries as to what could be got for the stock, and had not been able to find anyone who would give more than $90 per share, and that offer was made by said defendant, Corliss E. Sullivan, the son of this defendant. Said defendant, Corliss E. Sullivan, was a director in the Peerless Motor Car Company, having nominally fifty shares of stock in his name, which had been loaned to him by this defendant to qualify him to act as a member of the board of directors. He authorized this defendant to pay $90 per share for said stock, and this defendant paid plaintiff on said May 20, 1908, at said rate for said 170 shares of stock. Thereafter, when said Corliss E. Sullivan settled with this defendant for said purchase, he, for the first time, requested this defendant to keep seventy shares of said stock, as he did not want to borrow the amount he would have to if he paid for the whole stock, and he also repaid this defendant the fifty shares of stock which had been loaned to him by this defendant.

"This defendant denies that said stock was worth more than $90 per share, or that this defendant had any knowledge that said stock was worth more than $90 per share, and avers that $90 per share was as much as could then be got for said stock. The statement made to plaintiff by this defendant, that the best offer that he had been able to get of $90 per share, was true. He denies that he made any statement to plaintiff which was false or untrue, or made for the purpose of deceiving plaintiff, or which did deceive plaintiff, or that plaintiff relied upon any statement made by this defendant, or that this defendant was the banker of said the Peerless Motor Car Company, or fully, or at all informed as to the condition of said company, or that the book value of said stock at the time of said transfer was more than $90 per share, or that, at that time, large profits had been made, or that either of said defendants had any knowledge of the making of large profits by said the Peerless Motor Car Company, or that the book value of said stock was more than $90 per share, or that either of these defendants had any knowledge, either as to the profits made by said the Peerless Motor Car Company, or the book value of said stock, which was not disclosed to

plaintiff, or that was not equally as accessible to plaintiff as to these defendants, or either of them.

"Defendant avers that he and said Corliss E. Sullivan dealt with plaintiff at arm's length, and not in any respect as agents or trustees, or in a confidential relation.

"The probabilities of dividends being declared on said stock were as much within the knowledge of plaintiff as of this defendant.

"He avers that the transfer of the property of said corporation, and the issuance of stock in payment thereof, was entirely the result of matters and negotiations not known to exist, or existing, at the time of said purchase."

It will be noticed that in this answer the defendant, J. J. Sullivan, declares that when the sale of the stock was broached, he "replied to plaintiff that he would see what could be done about it." Again, he says, that he later "made inquiries as to what could be got for the stock and had not been able to find anyone who would give more than $90 per share." Still further he avers, that, "The statement made to plaintiff by this defendant that the best offer that he had been able to get of $90 per share, was true."

With these allegations the original answer, though it perhaps repelled the ascription of actual fraud to the defendant, J. J. Sullivan, clearly fixes upon him both the obligation of a fiduciary, and the breach of such obligation. But apart from the original answer, it is perfectly evident from Colonel Sullivan's own testimony that the plaintiff at least conceived their relation to be one of confidence reposed and accepted.

While it requires no citation of authorities to establish the proposition that the relation of banker and client is not necessarily of a fiduciary character, it is nevertheless evident that the relation may easily assume that character. The circumstances here were such as to make this transition easy. The plaintiff was not only a depositor in, but a borrower from, the defendant's bank. The stock which he sold was in a company which not only occupied a like relation to the bank, but in which Colonel Sullivan, its president, was a stockholder and represented by his son upon the board of directors, the son having

been qualified for that office by the loan to him of some of his father's stock. Under these circumstances an express form of words would hardly be necessary to characterize any effort on Mr. Sullivan's part to comply with the plaintiff's expressed wish to find a purchaser for his stock, as efforts made on behalf of the plaintiff and as his agent.

Their second interview was begun, according to Colonel Sullivan's own testimony, with the inquiry by plaintiff: "Have you heard of anyone who would be apt to buy my stock in the Peerless Company?"

"I said, 'I know a man who will give you $90 a share for it.' He said 'will it be in cash?' I said 'yes, certainly.' He then said 'it cost me par and I would like to get that for it.' And with that remark he left the bank.

"Q. Is that all that was said on the occasion of this visit?

"A. That was all that was said on the occasion of this visit.

"Q. Prior to that time had you talked with anybody about buying the Peerless stock other than with Corliss?

"A. No, sir.

"Q. And you never did try to sell his stock to anybody other than to Corliss?

"A. That question is not a correct question; I didn't try to sell it to Corliss.

"Q. Well, you never told anybody else but Corliss that Telling was willing to sell his stock?

"A. I don't recall now having made a statement about it to anybody else."

At page 182 of the transcript of testimony Colonel Sullivan testifies again concerning this interview with the plaintiff.

"On or about May 15 he called at the bank, and I am not sure which bank it was in, I think it was the Central National Bank. I was sitting at my desk and he said, 'Have you heard anything about the stock of the Peerless Motor Car Company?' I said 'I know a man—a person, I believe is what I said—who will give $90 a share for it. Mr. Telling didn't ask me who it was. He didn't ask me my advice as to the propriety of selling, but he said, 'will it be in cash?' and I said, 'certainly.' He then

Telling v. Sullivan.

said, 'well, it cost me par and I would like to get that for it, but I will think it over,' he said, and he then left the bank.''

Thus it appears by the testimony of Colonel Sullivan himself that the plaintiff did not consider himself to be dealing at arm's length, but the contrary.

The relationship was one of trust and confidence, and Colonel Sullivan's undertaking, though gratuitous and by no means absolute, was that of agency for the sale of plaintiff's stock.

The obligations arising from such a relationship are fully set forth by Boynton, J., in the *United States Rolling Stock Co. v. Railway*, 34 Ohio St. 450, 460 [32 Am. Rep. 380]:

"The rule that an agent or trustee in matters touching his agency, or pertaining to the trust, can not bind the principal or *cestui que trust*, without his consent, by a contract in which the former is adversely interested, rests upon a very satisfactory foundation, and is supported by a great weight of authority. *Wade* v. *Pettibone*, 11 Ohio 57; *Morison* v. *Thompson*, L. R. 9 Q. B. 480; 1 Leading Cases in Eq. 210.

"In Story on Agency, Sec. 210, the rule is said to be founded 'upon the plain and obvious consideration, that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence, and zeal of the agent for his own exclusive benefit. It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interest of his principal as far as he lawfully may.' And, in 2 Kent's Com. 618, the same principle is asserted, in the following language: 'An agent, acting as such, can not take upon himself, at the same time, an incompatible duty. He can not have an adverse interest or employment. He can not be both buyer and seller; for this would expose his fiduciary trust to abuse and fraud.' In *Bennett, Ex parte*, 10 Ves. 393, Lord Eldon, commenting on a sale of the trust property to the trustee, stated the reason of the rule denying the right of the trustee to buy the trust property to be, 'that it would not be safe, with reference to the administration of justice in the general affairs of the trust, that a trustee should be permitted to purchase; for human infirmity will, in very few instances, permit a man to exert against himself that

providence which a vendor ought to exert, in order to sell to the best advantage, and which a purchaser is at liberty to exert for himself, in order to purchase at the lowest price.' The rule which prevents the agent or trustee from acting for himself in a matter where his interest would conflict with his duty, also prevents him from acting for another whose interest is adverse to that of the principal; and, in all cases where, without the assent of the principal, the agent has assumed to act in such double capacity, the principal may avoid the transaction, at his election. No question of its fairness or unfairness can be raised. The law holds it constructively fraudulent, and voidable at the election of the principal.''

It is evident from the foregoing that Colonel Sullivan being the agent for the plaintiff, his purchase of the stock, if he did purchase it, was constructively fraudulent, and voidable at the election of the plaintiff.

This brings us to the second question in the case: Did Colonel Sullivan become the purchaser of the stock, or was he merely executing the order of his son Corliss for the purchase thereof? On this point, Colonel Sullivan testifies at page 181, that having talked the matter over with his son at the dinner table in their home, the latter finally said ''that while he would give $90 a share for it, he didn't think it would be a great buy at that, owing to the general uncertainty in which the industrial world was enveloped at that time.''

''Q. Did he say anything about the amount of money and number of shares of stock?

''A. Yes.

''Q. What?

''A. He said, 'It is a good deal of money to raise in these times; and he said 'if I get it, why I will have to fall back on the bank.'

''Q. Yes, and what else did he say?

''A. Well, that is about all I can recall now.''

. At page 184 Colonel Sullivan testifies to his final interview with the plaintiff, as follows:

''He called at the Superior Savings & Trust Company, of which company I am president, on May 20, 1908, and the first

Telling v. Sullivan.

salutation was, 'Well, I have made up my mind to let my stock go at $90 a share.' And I said, 'Why do you want to sell it?' He said, 'I want to raise a good deal of money at this time.' I said, 'Very well, I will be glad to loan you all the money you want.' He said, 'I would rather sell some things I have than to go in debt so much.' I said, 'Very well, if you have made up your mind to sell your stock, I will settle for it here and the party can pay me.' He didn't ask my advice; he didn't ask my opinion. We are frequently asked advice and opinions in matters of that sort, but as a rule, the general rule in our bank, each of the banks, we never advise people as to the sale or purchase of stocks. Our experience teaches us that there are apt to come up, as the result of such advice, pro and con complications such as this. Hence the rule is that we do not offer advice.

"Q. What else occurred at that time?

"A. I said to him, 'Have you got the stock with you?' He said, 'I have some of it and I can get the balance very shortly.' Then I called Mr. Darling, the secretary of the Superior Savings & Trust Company, and I said, 'Mr. Darling, you settle with Mr. Telling for 170 shares of stock of the Peerless Motor Car Company at $90 a share.' Mr. Darling was in my room at that time and he then stepped out into his room which is connected by an open door, and he and Mr. Telling settled for the stock in Mr. Darling's room. There was somebody waiting for me at that time and he came into my room and took up another subject. Mr. Darling prepared the checks for Mr. Telling in manner and form and in amounts as he desired, brought them to me and I looked them over, put the footing together so as to be sure that they aggregated the right amount, and I signed the checks and Mr. Darling handed them to Mr. Telling.

"Q. Have you now told all that was said between you and Mr. Telling on that occasion?

"A. Yes.

"Q. Did you at that time communicate to him in any way anything that had been said to you by Corliss?

"A. No.

21 O. C. C. Vol. 32.

Cuyahoga County.

"Q. Did you say anything to him about the value of the stock?

"A. Not a word."

Again at page 186, Colonel Sullivan testifies:

"Q. Returning to May 20, 1908, what talk was there between you and Corliss Sullivan that night?

"A. I belive the matter first came up, I don't want the court to infer that we only talk business at my table, but as a matter of fact, we have discussed the incidents of the day quite frequently at the dinner table. I told Corliss that Telling had called at the bank and said that he had made up his mind to let his 170 shares of stock in the Peerless Motor Car Company go at $90 a share.

"Q. Go on.

"A. Corliss remarked, 'Well, I will have to depend on you to help me out a little in furnishing the money,' and I said, 'Now, that is a good deal of money at this time.' He said, 'I know it is.' I said, 'How much would you want?' 'Well', he said, he 'wouldn't know until tomorrow morning, I will figure up and see where I stand.' And I said to him, 'I paid for the stock, I gave Mr. Telling my checks for the stock so that whenever you are ready you come down to my office and settle for it.' He said, 'All right, I will go down to the bank in the morning and I will pay you for it.'

"A. That was about all that occurred that night."

Again at page 188 Colonel Sullivan testifies:

"The next morning Corliss called at the bank about, as near as I can remember, ten o'clock, and he said, 'I have been figuring over that matter and I am a little afraid that it will involve me in debt too much if I should borrow all the money required to pay for all the stock.' I then laughed at him. I said, 'I thought you were over-reaching yourself a little,' and he said, 'Well I have made up my mind that I don't want to go in debt to the extent that I would be required to go in debt to pay for the 170 shares,' and he said, 'I wish that you would take seventy shares of it off my hands.'

"Q. What did you say?

"A. I said, 'I don't want the stock.' I said, 'I could have

Telling v. Sullivan.

bought it all from Mr. Telling if I wanted any of it, but I didn't want any of it and don't want any of it now.' He said, 'Well, of course, if you feel that you don't want it, I will have to arrange for it, but I would a little rather not take it all.' So I then said, 'Very well, if you feel that way about it, and you don't want it all and you want me to take seventy shares of it, I will do it.'

"Q. Is that all?

"A. That is about all, except that I turned the stock over to Corliss. Mr. Darling, I believe, held the stock over night in his possession for me. I turned the stock over to Corliss.

"Q. Will you state whether this was the first time that. there had been any talk about your taking any of the stock?

"A. That was the first time that any talk had been between Corliss and me relative to my taking any portion of the 170 shares of stock which Mr. Telling had sold."

Corliss testifies on the same subject: "I said I would give $90 a share for this stock." And again: "I said that $90 a. share was what I could give for the 170 shares that Mr. Telling had."

Detailing the conversation between himself and his father at some length, and in substantial accord with his father's testimony, Corliss Sullivan adds: "There was nothing unusual in my father's speaking to me about money matters and the occurrences of the day. We do it quite frequently. Daily,. practically."

Corliss further testifies: "The third time I had a talk with father about Telling's stock was a week or ten days after the second time. Father came home in the evening, and in going over the news of the day mentioned this matter to me; that. Telling had been in, and said that he would sell his stock at $90 a share, and I said all right. I said what shape is it in? Did he: deliver the certificates, and father said: 'Yes, he left them with me, and I paid him for them.' I said, 'All right, I will be down tomorrow morning and fix up the matter with you.' The next day, I said to my father, 'I will have to get $9300 in order to. pay for it and I would much rather not borrow that much money at this time; I would like to have you take about seventy

shares of this and I will take the one hundred.' His answer to that was: 'Well now, you went ahead and bought this; I thought you were going pretty strong on it, but it is too late now, and if you will only take the one hundred, I will have to take the seventy.' "

From the foregoing it is apparent first, that although Corliss authorized the statement that he would buy the stock, he gave no express directions to his father either to purchase it for him or to pay for it in his behalf.

Colonel Sullivan advised Telling that he knew of a person who would purchase the stock, and thereafter he received and paid for the same, without further disclosing the purchaser's identity. This undisclosed person was his own son, a member of his own family, with whom he constantly maintained the closest and most confidential relations. In settling the transaction with his son the following day, he found himself constrained to keep a large part of the stock, which he did accordingly; and for the son's purchase of the remainder, the father, through the bank, of which he was president, loaned the purchase price to the son. These were not separate transactions; they were all parts of a single transaction. Under the circumstances that existed, Colonel Sullivan not only had no right, without full disclosure of the fact, to purchase the stock, or any part of it himself, but he could not act as plaintiff's agent in the sale of the whole or any part thereof to his son, except with plaintiff's full knowledge and consent. In fact, he himself became the purchaser when he paid the purchase price, and the division of the stock between himself and his son does not alter the case.

The whole transaction was constructively fraudulent and voidable.

The only question remaining is the defense of laches. The plaintiff discovered the identity of the real purchasers of the stock in August, 1908. Petition was filed in this case on January 18, 1910.

The defendants claim that this lapse of time is sufficient in an action in equity to bar a recovery, though were the action at law the statute of limitations, four years from the discovery of

Telling v. Sullivan.

the fraud, would apply. It is asserted that we have here a stale equity. This defense also assumes the form of a claim of ratification of the transaction by acquiescence therein.

In the Ohio cases on the subject, the doctrine is variously stated as follows:

In *Larrowe* v. *Beam,* 10 Ohio 498, Judge Grimke says, page 502: "If the party be guilty of such laches in prosecuting his title as would bar him, if his title were solely at law, he shall be barred in equity."

Read, J., in *Gibler* 'v. *Trimble,* 14 Ohio 323, at page 343, says: "Stale equities will not be enforced; when a party, having an equity, neglects to enforce it, for a period which would constitute a bar at law, under the statute of limitations—in analogy to the statute—it will also be barred in equity."

In the case of *Longworth* v. *Hunt,* 11 Ohio St. 194, Brinkerhoff, C. J., says, page 201:

"In cases of which courts of equity and courts of law have concurrent jurisdiction, the former act in obedience to statutes of limitation; but in cases of which equity has exclusive jurisdiction, they act only in analogy to them. This case is of the latter kind; for, the bar of the statute being complete at law, a court of equity, alone, can give relief. The statute of limitations does not, in terms, apply to this proceeding; and we are, therefore, left to the exercise of a sound legal discretion as to whether or not we will hold a lapse of time, correspondent to the time constituting a statutory bar at law, to be a bar to this proceeding.

"An attempt of Benjamin V. Hunt to set up the lapse of time in defense to the claim of Piatt's heirs, in view of the relation which he sustained to them when the survey was made, would be most unconscionable; and, being at liberty to close our ears against it, we are unwilling to listen to it when it comes from those who represent him."

In the case of *Mack* v. *Brammer,* 28 Ohio St. 508, the court say, page 516:

"But it is said the plaintiff's claim is barred by lapse of time; not that it is barred by the statute of limitations, but that it cannot be enforced in equity, for the reason that it has be-

come stale. It is only necessary to say upon this point, that it is questionable if the plaintiff had a distinct knowledge of her rights until near the time the action was brought.''

In the case of *Paschall* v. *Hinderer*, 28 Ohio St. 568, the Supreme Court Commission, speaking by Johnson, J., at page 580, say:

''What constitutes a stale equity is a vexed question hardly susceptible of an accurate definition. Length of time alone is not a test of staleness.''

The doctrine of laches, merging into ratification, is nowhere more forcibly expressed than in the case of *United States Rolling Stock Co.* v. *Railway, supra*, wherein Boynton, J., says at page 462:

''Mr. Wharton, in his work on Agency, Sec. 244, says: 'So, also, a principal, when fully knowing the facts, can ratify the agent's action, though tainted with employment by an opposing party.'

''The doctrine is equally well settled that the option to avoid the contract must be exercised by the principal within a reasonable time after being fully apprised of the circumstances of the agent's engagement.

'' 'Where the principal is informed of what has been done, he must dissent, and give notice of it within a reasonable time; and if he does not, his assent and ratification will be presumed.' 2 Kent, Commentaries 616; Paley, Agency 172.

''What constitutes a reasonable time must largely, if not wholly, depend on the circumstances of the particular case. Where the consequences of delay are or may prove injurious to the other contracting party, especially where large expenditures, to the knowledge of the principal, are being made, on the faith of the validity of the contract, the law requires prompt action on his part, if he would avoid responsibility for the acts of the agent. His right to avoid being one arising in equity, is governed by the rules upon which that court administers justice He must speak when he should, or he will not be permitted to speak when he would. In *Smith* v. *Clay*, 3 Bro. C. C. 639 (n), Lord Camden, adverting to the principles which govern a court of equity, where a party has slept upon his rights, said: 'A

Telling v. Sullivan.

court of equity has always refused its aid to stale demands, where a party has slept on his right, and acquiesced for a great length of time.

" 'Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced.' "

A fair summary of the Ohio law on the subject is found in the opinion of a federal judge in another state. Farrington, district judge, in the case of *Brissell* v. *Knapp*, 155 Fed. Rep. 809, 810, says:

"The rules controlling the application of the doctrine of laches are among the most characteristic in equity jurisprudence. If unreasonable delay in seeking relief is the only element to be considered, courts of equity will usually follow the statute of limitations, if there be one which is applicable. The statute of limitations is an arbitrary rule. The doctrine of laches is flexible. Its application depends upon the circumstances of each case. It will not, save in exceptional cases, be applied unless there are conditions other than mere lapse of time which render the maintenance of the suit inequitable and unjust. Laches is not merely a matter of time. It is a question of equity or inequity, of justice or injustice. *Kelley* v. *Boettcher*, 85 Fed. 55, 62 [29 C. C. A. 14]; *Williamson* v. *Monroe*, 101 Fed. Rep. 322, 330.

" 'Laches', says the Supreme Court of the United States in *Galliher* v. *Cadwell*, 145 U. S. 368, 373 [12 Sup. Ct. 873, 875; 36 L. Ed. 738], 'is not, like limitation, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.'

"The questions which must be asked and answered in deciding each case are: Has the delay been unreasonable? If so, have the conditions or the relations of the property, or of the parties, so changed that it would be inequitable and unjust to permit the plaintiff to enforce his claim? If, during the long delay, important testimony has been lost or destroyed, and the memory of the original transaction becomes hazy and in-

distinct, a court of equity may refuse to grant relief because
of its inability to do certain and complete justice. *Speidell* v.
*Henrici,* 15 Fed. Rep. 753, 756; *Selden* v. *Kennedy,* 104 Va.
826 [32 S. E. Rep. 635; 4 L. R. A. (N. S.) 944]. If, during
the delay, the property in dispute has passed into the hands of
innocent purchasers, or the defendant has been lulled into
doing something which he would not have done, except he had
been led to believe that the claim was abandoned, the rule of
laches may be applied. *Tazewell* v. *Saunders,* 54 Va. (13
Gratt.) 354, 362.

"If the defendant has risked large sums of money de-
veloping the property, as a result of which it has greatly in-
creased in value, and the plaintiff has suffered this to be done,
intending if the venture proved profitable to assert his claim,
but, if unprofitable, to allow the defendant to pay all the losses,
then in such a case the court will be justified in saying to the
plaintiff: 'You have been guilty of laches, your delay was not
without a motive, and that motive was not good. You were
silent while the defendant was risking his money and his labor,
but now, when there are no chances to take, you are willing to
come in and share the profits.' The dominant idea in cases
where the doctrine of laches has been applied is that the delay
has been productive of changes which render it unjust and
unfair to prosecute the suit. If the delay has not prejudiced
the defendant, there is no laches. *Pacific Ry.* v. *Railway,* 20
Fed. Rep. 277; *Bartlett* v. *Ambrose,* 78 Fed. Rep. 839 [24 C.
C. A. 397]; *Williamson* v. *Monroe,* 101 Fed. Rep. 322, 329;
*London & San Francisco Bank* v. *Dexter Horton & Co.* 126
Fed. Rep. 593, 601 [61 C. C. A. 515]; *Galliher* v. *Cadwell,* 145
U. S. 368, 373 [12 Sup. Ct. 873; 36 L. Ed. 738]; *Cahill* v.
*Superior Court,* 145 Cal. 42 [78 Pac. Rep. 467]; *Cook* v. *Ceas,*
147 Cal. 614 [82 Pac. Rep. 370]; *Hawley* v. *Von Lanken,* (Neb.)
[106 N. W. Rep. 456]; *Daggers* v. *Van Dyck,* 37 N. J. Eq. 130;
*Rozell* v. *Chicago Mill & Lumber Co.* 76 Ark. 525 [89 S. W.
Rep. 469]; *Demuth* v. *Bank,* 85 Md. 326 [37 Atl. Rep. 266; 60
Am. St. Rep. 322]."

If the application of the doctrine of laches depends upon
the circumstances of each case, the inquiry arises: What are
the circumstances of this case?

Telling v. Sullivan.

The transaction here in question occurred May 20, 1908. The stock continued to rise in value thereafter. Rumors of this came to Telling. In the neighborhood of a couple of months afterward Telling met Sullivan in the middle of the floor as he was walking in the bank and said: "Colonel, haven't I made an awful mistake in letting this Peerless stock go?" He said, "Yes," and walked away without telling who the real purchaser of the stock was.

Kittredge, president of the Peerless Company testifies that in August, Telling came to his office and they discussed matters. Telling said, "Who got my stock?" Kittredge replied: "Colonel Sullivan got some of it." Telling said, "The hell you say?" "We then drifted into lighter vein."

The lighter vein was to the effect that Telling said: "Of course I would like the Peerless stock, and probably made a mistake in selling it, but I am satisfied."

Cameron, assistant cashier of the Central National Bank, testifies to a conversation with Telling several months after the transaction (probably in August) in which Telling said he had made a hell of a mistake selling that Peerless stock and added: "Of course I can't blame anybody but myself, and I took the money I got out of that and did very well with it in other matters, and while I had better have disposed of something else than that, as they are doing a very fine business out there—he thought it was a great mistake."

Telling admits the profane remarks attributed to him by Kittredge and Cameron but denies that he said to either of them that he was satisfied and his expletives quoted lead us to the conclusion that he was not satisfied.

Telling further testifies:

"Anyway I knew that Colonel Sullivan had this stock in the summer of 1908. I knew it when I saw Kittredge for the first time, positively. That was in the summer of 1908. (We know from Kittredge that it was in August.) That was the first time I heard it positively; I had heard rumors before. I wanted to be sure, so I went to Mr. Kittredge and asked it. Mr. Siddall asked me why I had not come to see him before I sold him; that he would have told me what it was worth. I did not go to see

Cuyahoga County.

Colonel Sullivan after the sale of the stock because I thought he was too slick for me; I always patted him as he patted me, with a glad hand.  I knew I would have to bring a suit some day, when my attorney from New York got back, but he is there yet.''

His attorney was B. B. Avery, who went to New York on traction matters and remained there.  After waiting for his return, he finally sought another lawyer, but not until the middle of September of the next year, when he retained Judge F. L. Taft to look after his interests.  It is questionable whether the plaintiff had a distinct knowledge of his rights until he consulted Judge Taft.  Judge Taft appears to  have used due diligence in investigating the facts and took the matter up with Colonel Sullivan, writing him a letter October 18, 1909.  The latter put him off until the day after election in November, when Taft made a formal tender of the amount paid by Mr. Sullivan to Mr. Telling with interest down to that time.

Judge Taft then heard from Mr. Cannon, attorney for Mr. Sullivan, and gave to him a petition he had prepared, ''in order that he might file an answer at the same time the petition was filed.''  This was at Mr. Cannon's request.

''Later the South Cleveland Bank failed and Mr. Cannon telephoned to me,'' says Judge Taft, ''and requested that he might delay filing the petition.  Shortly  before  the  South Cleveland Bank failed, the Werner Company had gone into the hands of the Superior Savings & Trust Company, as receiver, and Mr. Cannon suggested that it was not a good thing to be filing suits against bankers, and would I let the matter stand a few days.  It did stand then until I called Mr. Cannon up and urged him to file the petition, or else I would have to get another copy and file it myself, as considerable delay had taken place.  And finally the petition was filed at the time indicated, in January.'"

The petition was verified December 17, 1909, and filed January 18, 1910.

It thus appears that Telling did nothing but await the return of Avery, from August, 1908, to September, 1909, thirteen months.

### Telling v. Sullivan.

The testimony discloses that the stock commenced going up in August, 1908, and after the election of that year it went up enormously, the full effects of the increased business not being ascertained until December, 1908. Before September, 1909, the value of the stock was doubled and large dividends were paid.

It seems apparent from the record that Telling kept track of the value of the stock from and after his talk with Kittridge in August, 1908.

There has been no change in the position of the defendants. They still retain the stock in question and the defendant, J. J. Sullivan, is now a stockholder in the Peerless Motor Car Company to the extent of more than the number of shares in controversy. The only change has been in the value of the stock. The defendants have not incurred any expense, but have received large dividends.

It thus appears that the mere lapse of time is the only thing upon which the defendants rely as establishing their defense of laches. Counsel points out a single inequity resulting therefrom, that the delay enabled the plaintiff to speculate upon the transaction. It is said that plaintiff would not have brought this action if the stock had not gone up. That may be conceded. All suits are brought because the plaintiff anticipates some advantage therefrom.

But is it not inequitable to allow the defendant to realize this large profit from a transaction which the law says was at least constructively fraudulent? Good morals would not interpose this defense, but would suggest that at the time the transaction occurred, the defendant might himself have limited any delay and obviated any speculation by candidly stating who the purchasers were and calling upon the plaintiff to ratify or rescind the sale within what he considered a reasonable time. He had the opportunity to do so, but passed it by. He should not now be heard to claim that thirteen months was too long a time for the defendant to take to make up his mind.

Longer time was not held to create a stale equity in the following cases: *Pacific Ry.* v. *Railway,* 20 Fed. Rep. 277; *Bogan* v. *Mortgage Co.* 63 Fed. Rep. 192; *Ide* v. *Carpet Co.* 115 Fed. Rep. 137; *Brun* v. *Mann,* 151 Fed. Rep. 145.

### Cuyahoga County.

It is doubtless true, however, that where mere lapse of time has been relied upon, the statute of limitations alone has been raised and the defense of stale equity has not even been suggested. Hence, while many cases have been cited where other circumstances than mere lapse of time have led to the court's applying the doctrine of laches, few are found where this defense has been denied. See the case of *Moore* v. *Bank,* 31 O. C. C. 614 (12 N. S. 529), decided by this court a year ago, a case very similar to this, yet the defense of laches was not raised The statute of limitations alone was relied upon.

It has been well said that "the profitableness of a fraudulent transaction can never be its justification, and it can never shorten the arm of the court."

The parties in this action are in almost exactly the same situation they were in at the time the wrong complained of was committed, and relief can be given the plaintiff, without doing any injustice whatever to the defendant.

We find that the defendant, J. J. Sullivan, is in a position to turn over to the plaintiff 170 shares of stock in the Peerless Motor Car Company and receive therefor all the money he parted with, with interest to date, and such is the order of the court.

This conclusion addresses itself to the sound discretion of the court in the premises and conforms not alone to good morals, but to the equities of the case. Indeed, the two should be, and usually are, synonymous.

Judgment for the plaintiff, see journal.

Of course there must be an accounting of the dividends.

Certain rulings on evidence have been requested which will be indicated on the bill of exceptions.

**Henry** and **Marvin, JJ.,** concur.